**R. SHANE JOHNSON (14217)**
shane@utahdefense.com
75 EAST 400 SOUTH, SUITE 201
SALT LAKE CITY, UTAH 84111-5124
(801) 364-2222 PHONE
*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| TRUDY HEMINGWAY, DANIEL MCGUIRE, MICHAEL MCGUIRE, and AARON CHRISTENSEN, individuals,<br><br>*Plaintiffs*,<br><br>*-v-*<br><br>E. ROBERT RUSSO, CHRISTOPHER MCHUGH, BRADLEY BAILEY, DANIEL BARTLETT, DANIEL MORZELEWSKI, and KEVIN WYATT, individually and in their official capacities as Cottonwood Heights police employees; the CITY OF COTTONWOOD HEIGHTS; JAMES WINDER, SAUL BAILEY, EDWIN MEONO, ALAN JEWETT, JASON ACKERMAN, JASON HUGGARD, BRYAN MARSHALL, BRADY COTTAM, JASON GAVIN, COREY LAVIN, GRAYSON VANLEEUWEN, RYAN WOLF, KENT KOBAYASHI, MICHAEL LEE, DAN CHILD, MIKAL WERSLAND, PAUL BARKER, MICHAEL NAYLOR, PAUL LARSON, MATT BROWNLEE, NATHAN LORD, SAMUEL CARPENTER, DAVID COOVER, EMBRETT FOSSUM, JOSE LOPEZ, and STEVE BALL, individually and in their official capacities as United Police Department employees; UNIFIED POLICE DEPARTMENT; and JOHN DOES 1-20, whose identities are currently unknown,<br><br>*Defendants*. | **AMENDED COMPLAINT**<br><br>Civil № 2:16-cv-00313<br><br>Judge Jill N. Parrish<br>Magistrate Evelyn J. Furse |

Plaintiffs, by and through their undersigned counsel of record, hereby submit this Amended Complaint against Defendants, and assert the following allegations in their totality and in the alternative:

**PRELIMINARY STATEMENT**

The following allegations are based upon the undersigneds' understanding of information presently available. This is a civil rights action in which Plaintiffs seek relief for the Defendants' violations of their rights as guaranteed by the United States Constitution, specifically, the First, Fourth, Fifth, and/or Fourteenth Amendments, which are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983, § 1985 and § 1988. This action also seeks relief under the Constitution of the State of Utah, Article I, Sections 1, 7, 9, and 14, to the extent applicable under the facts.

On the early morning of November 4, 2015, the Plaintiffs were sound asleep in their Taylorsville, Utah, home. Employees of Unified Police Department ("UPD") surrounded the home and executed a no-knock search warrant that was obtained by Defendant Christopher McHugh, a detective employed by the Cottonwood Heights Police Department ("CHPD"). Using explosives and battering rams, Defendants breached the home at five locations—through the front door, the rear door, two basement windows and a basement apartment door.

The warrant Defendants relied on to violently raid Plaintiffs' home and arrest Plaintiffs at gunpoint was obtained through material misrepresentations and omissions. Prior to obtaining the search warrant, or prior to executing it, Defendants knew or

should have known the Hemingway family and their residence were not associated with illegal activity or the suspect Misty Italasano. Defendants knew the search warrant identified a multi-unit dwelling, and knew Italasano rented a basement apartment in the Hemingway family's residence. Defendant Christopher McHugh omitted all such material information from his warrant application, and the UPD Defendants nonetheless executed the warrant on Plaintiffs' residence, arrested Plaintiffs at gunpoint, and detained them for hours. Moreover, the force employed to detain the Hemingway family was unconstitutionally excessive and unnecessarily rigorous, as was the forced used to breach the home in the first place. That is, Defendants unnecessarily used military-grade explosives to invade the home, arrested Plaintiffs at gunpoint, handcuffed them, detained them in various states of undress in freezing temperatures for more than two hours, and refused their requests for medicine, medical attention, water and bathroom breaks.

Finally, police violated Daniel McGuire's rights to free speech and protest when they threatened to jail him for verbally protesting his family's abhorrent treatment.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on each and every one of their claims as pleaded herein.

## PARTIES

1. Plaintiff Trudy Hemingway ("Trudy") is a citizen of the United States and a resident of Salt Lake County, State of Utah. She is the mother of Plaintiffs Daniel McGuire, Michael McGuire and Aaron Christensen.

2. Plaintiff Daniel McGuire ("Daniel") is a citizen of the United States and a resident of Salt Lake County, State of Utah.

3. Plaintiff Michael McGuire ("Michael") is a citizen of the United States and a resident of Salt Lake County, State of Utah.

4. Plaintiff Aaron Christensen ("Aaron") is a citizen of the United States and a resident of Salt Lake County, State of Utah.

5. Defendant City of Cottonwood Heights ("Cottonwood Heights") is a political subdivision of the State of Utah.

6. Defendant Unified Police Department ("UPD") is a political subdivision of the State of Utah.

7. At all relevant times, Defendants E. Robert Russo, Christopher McHugh, Bradley Bailey, Daniel Bartlett, Daniel Morzelewski and Kevin Wyatt were employed as police officers for the Cottonwood Heights Police Department ("CHPD"). At all times alleged in this Complaint, these Defendants were acting in the course and scope of their employment, and under the color of law. Plaintiffs are suing these Defendants in their individual and official capacities.

8. At all relevant times, Defendants James Winder, Saul bailey, edwin Meono, Alan Jewett, Jason Ackerman, Jason Huggard, Bryan Marshall, Brady Cottam, Jason Gavin, Corey Lavin, Grayson VanLeeuwen, Ryan Wolf, Kent Kobayashi, Michael Lee, Dan Child, Mikal Wersland, Paul Barker, Michael Naylor, Paul Larson, Matt Brownlee, Nathan Lord, Samuel Carpenter, David Coover, Embrett Fossum, Jose Lopez, and Steve Ball were employed as police officers for Unified Police Department ("UPD"). At

all times alleged herein, these Defendants were acting in the course and scope of their employment, and under the color of law. Plaintiffs are suing these Defendants in their individual and official capacities.

9. At all relevant times, Defendants John Does 1-20 were employed by CHPD or Unified Police Department ("UPD"). At all times relevant to this Complaint, John Does 1-20 were acting within the course and scope of their employment with these government agencies, and under the color of law. Plaintiffs are suing these Defendants in their individual and official capacities.

## JURISDICTION AND VENUE

10. This action arises under the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Accordingly, the Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

11. The claims made in this Complaint occurred and arose in Salt Lake County, State of Utah. Accordingly, venue is proper under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

12. Shortly after 3:00 a.m. on November 4, 2015, Trudy Hemingway and her three sons were sleeping in their Taylorsville home.

13. Approximately 25 UPD Defendantsassembled outside the home in preparation for a search warrant service.

14. Without warning, police (hereinafter, "police" is used interchangeably to identify Defendants) forced entry into the home at five different access points. They

breached the front solid aluminum door, a rear glass door, two basement windows by way of window wells, and the solid aluminum entry door to a basement mother-in-law apartment on the south side of the residence.

15. Trudy leased the mother-in-law apartment to the target of the police investigation, Misty Italasano, beginning in April 2014.

16. Police used military-grade explosives to breach the home, subjecting the Plaintiffs' to deafening explosions,glass shooting across rooms, and immediate and lasting ear trauma for Plaintiff Daniel McGuire.

17. A neighbor in a home approximately 100 yards away heard what he believed to be a violent vehicle collision and two distinct explosions.

18. Police, however, did not enter the home through the blown out windows.

19. Daniel, a musician and social activist, was asleep in a basement bedroom, and woke to the explosions.

20. Covered in glass, partially deafened by the blasts, and with his ears ringing, Daniel believed he had been shot and was being shot at by home invasion robbers.

21. Naked, Daniel scrambled out of bed and raced up the stairs to alert his family, screaming over and over "Call 911!"

22. Daniel was met by armed police, pointing assault rifles and flashlights at his head.

23. Daniel immediately dropped to a prone position with hands raised. Police ordered Daniel to stand. Daniel pleaded to be allowed to put on a pair of pants. Police

eventually allowed Daniel to grab a nearby pair of pants belonging to his younger and much smaller brother Aaron. Police then handcuffed Daniel.

24. Aaron Christensen, an 18-year-old delivery driver, was startled awake on the morning of the raid by a deafening blast.

25. Aaron slipped on a pair of pajama pants and walked out of his bedroom where he was met by officers pointing assault rifles at him from three directions.

26. Aaron saw that Daniel had his hands raised, so he followed suit.

27. Aaron heard his dogs barking and, afraid that police would kill them, he repeatedly asked police where they were. Police ignored Aaron's concerns and handcuffed him.

28. Michael awoke to what he thought was a car bomb or airplane crash and glass exploding in the home.

29. Michael next heard Daniel screaming "call 911," followed by screams for Daniel to get on the ground.

30. Michael then heard a voice from a loud speaker order the family to come out with their hands up.

31. Michael exited his bedroom and encountered what he believed to be at least three "army men" with guns pointed at him. He was also handcuffed by police.

32. Trudy, a long-time Utah Transit Authority bus driver who now delivers sandwiches for Jimmy Johns, was also rousted at gunpoint and handcuffed.

33. Police immediately ordered the family members out of the home and into the street.

34. Over the course of the family's subsequent two-hour detention, the temperature ranged between 33- and 37-degrees Fahrenheit, with sustained winds of approximately four to eight miles per hour.

35. Trudy was dressed in nothing but a robe and slippers; Michael wore underclothes, a robe and slippers; and Daniel and Aaron had on nothing but pants, remaining barefoot and shirtless throughout their detention.

36. The family shivered violently, and their teeth chattered uncontrollably for the next two-plus hours. Aaron nonetheless took this as a good sign—an indication that his body was kicking in to survival mode to ensure he would not die of exposure.

37. Daniel quickly realized that police were targeting Italasano, and he repeatedly explained to police that his mother's tenant merely rented an apartment and was otherwise unassociated with his family and their home. Defendants nonetheless continued to detain the Plaintiffs.

38. Unlike Daniel, Aaron was deliberately calm and quiet, hoping it would speed things along.

39. Trudy repeatedly asked to see a warrant, and asked police what was going on. Police ignored her questions and ordered her and her sons not to speak to police or each other.

40. Police continued to detain the family for approximately 45 minutes on the street, in freezing weather, in various states of dress, for all their neighbors to see.

41. After repeated complaints about the cold, police herded the shivering family along with Italasano and Italasano's house guest into the back of a police paddy wagon.

42. Trudy, who has diabetes, told police she needed to take her medicine and requested a glass of water. Police told her no.

43. Trudy also has had meniscus tears in both knees, which she told police in requesting a stool to step up into the van. Her request was denied, and an officer instead painfully and forcefully grabbed Hemingway's arm and forced her up into the paddy wagon.

44. Trudy requested that police turn on the heat in the paddy wagon, which was followed by even colder air blowing into the van. Trudy asked police to turn off the air conditioning, which they did after about five more minutes.

45. Daniel complained to police about a leg injury and ear pain sustained from the explosion of his bedroom window, and he requested medical attention for a painful contusion that had raised on his knee. An officer denied the request, briefly inspected Daniel's leg and told him he would be fine.

46. Police detained the family in the van for approximately 30 minutes more before ordering them back into the street.

47. Trudy was again painfully forced out of the van.

48. An officer placed an additional set of handcuffs on Trudy, and then had difficulty removing the first pair. The plainclothes officer twisted Trudy's wrists as she cried out in pain.

49. Police also painfully switched out handcuffs on Daniel, Michael, and Aaron.

50. Police then led the family members individually back into their home.

51. Police told the family they were going to search the home with a drug dog.

52. A plainclothes officer placed the warrant on the kitchen table.

53. Trudy asked to see the warrant, but police didn't provide it to her.

54. Trudy again asked for a glass of water, and this time an officer provided one.

55. Daniel asked police to take off Trudy's handcuffs, telling them she's the most innocent person he knows and police removed Trudy's handcuffs.

56. The family, with the men still handcuffed, remained in the living room for another half hour, still shivering uncontrollably due to freezing air blowing through the open front door and shattered rear glass door.

57. Michael repeatedly asked to use the restroom; police repeatedly told him to wait.

58. An officer asked Trudy questions about her sons. Daniel interjected, telling the officer to "mind your own fucking business." The officer removed Daniel from the living room to the kitchen and lectured Daniel about his attitude.

59. Daniel shivered and his teeth chattered uncontrollably as he stood next to the shattered rear glass door. An officer draped a small blanket belonging to the family dog around Daniel's shoulders.

60. An officer told Daniel that he had outstanding warrants for an old traffic ticket and another infraction charge, and then threatened to take Daniel to jail on the warrants if police didn't like his attitude. Daniel's protests about his family's treatment ceased immediately.

61. An officer took Trudy into the garage, and asked if she thought her sons possessed anything illegal. She told them no. The officer told Hemingway to go back in

the house and ask her sons if they had anything illegal, stressing that he wasn't concerned about a little marijuana. Trudy asked her sons, and they all said no.

62. Police then ordered the entire family into the garage while they searched the house. Police detained the family in the garage for approximately 30 minutes.

63. Michael could no longer restrain himself and relieved himself in a bucket, but he also urinated on his hands, pants, robe and feet in the process due to being handcuffed behind his back.

64. Having located no contraband in the family's home, police uncuffed the three men and left shortly after with no fanfare.

65. The family was left to clean up their devastated home and secure the entrances with whatever they had laying around.

66. An officer came back in the home and told the family they would have to secure the entrance to Italasano's apartment as well. (The apartment door was nowhere to be found). Aaron asked, "How?" The officer responded, "I don't know; it's your house."

67. As a result of Defendants' conduct, Plaintiffs continue to feel unsafe in their own home.

68. Plaintiffs relive the raid through flashbacks and nightmares.

69. Plaintiffs are routinely startled to attention by the sound of a door slamming or the sight of lights coming through the living room window.

70. Daniel worries that the next police raid, likely to find him with a guitar in hand, could result in police mistaking the guitar for a weapon and killing him.

71. Daniel, a political activist, also fears that he will be singled out for official retaliation if he continues his public advocacy for causes, including police reform and accountability.

72. Daniel received medical treatment for ear trauma and a diagnosis of hearing loss.

73. Trudy fears retaliation for seeking redress from those involved, and she is contemplating selling the family home and moving somewhere police won't be able to find her.

74. Aaron has tried to put the event out of his mind. A few weeks after the raid, however, he experienced a night terror, lucidly dreaming of a loud explosion followed by "government goons" storming the house to kill him and his family.

75. Michael has also experienced flashbacks triggered by loud noises or bright lights, and he's had nightmares rife with explosions and police raiding the family home.

76. Michael has experienced severe neck and back pain stemming from the raid for which he's received medical treatment.

77. Since the raid, Daniel, Michael and Aaron were stopped by Unified Police officers while driving to the IMC emergency room in Murray for extreme back and neck pain Michael was experiencing late on November 22, 2015.

78. The officer claimed he stopped the vehicle because Aaron had crossed a lane marker. This didn't happen.

79. Daniel and Aaron explained to the officer that Michael was having a medical emergency, and the officer said he'd call for medical assistance.

80. The officer then ordered Aaron out of the vehicle and questioned him for approximately 15 minutes about Italasano's current whereabouts. No medical help arrived.

81. Desperate with frustration, Aaron tearfully pleaded with the officer to be allowed to continue to the emergency room. The officer then released the brothers to continue on their way.

82. Defendants have since made no contact with Plaintiffs concerning the raid.

**Misty Italasano's Apartment**

83. Beginning in April 2014, Hemingway leased a basement apartment to Misty Italasano, the daughter of Hemingway's friend from church.

84. The apartment is accessed by way of a worn pathway leading from the front yard through a vinyl gate to a recessed concrete stairway on the south side of the Plaintiff's residence at 4796 S. 3475 West, Taylorsville.

85. Immediately upon entering the apartment, all the trappings of a self-contained home are apparent.

86. Visible just inside the entrance is a kitchen, replete with a washer-dryer unit, refrigerator, dishwasher, oven, stovetop, kitchen cabinetry and a bathroom.

87. Beyond the kitchen there is a bedroom and a family room.

88. In the family room, a door separates the apartment from the Hemingway family's living quarters.

89. The door is secured with a double-sided deadbolt, accessible only by a key in Trudy's possession.

90. At the time of the raid, Italasano had storage containers and a house plant stacked in front of her side of the separating door.

91. Unable to open the door, a police officer unsuccessfully attempted to break through the separating door, breaking a small hole through both sides, but the officer ultimately ceased those efforts for unknown reasons.

**The Search Warrant Affidavit**

92. On October 30, 2015, Cottonwood Heights Police Detective Christopher McHugh applied for and obtained search warrants to search residences at 4796 S. 3475 West, Taylorsville (the Hemingway home) and 2843 S. 8850 West, Magna on suspicion that Misty Italasano was involved in illegal distribution of controlled substances.

93. Police executed the warrants five days later on the early morning of November 4, 2015.

94. Det. McHugh alleged that sometime within the 15 days prior he met with a confidential informant ("CI") who reported purchasing methamphetamine from Italasano for several years. Det. McHugh began an investigation with the CI's assistance.

95. Det. McHugh alleged he conducted surveillance of both residences and observed short stay traffic, with people entering "the residence" for 5 to 7 minutes and then leaving, or with Italasano exiting and making brief contact with the driver of a vehicle before the vehicle would depart.

96. Det. McHugh alleged that when short stay traffic at the Taylorsville residence stopped, it would start at the Magna residence.

97. Det. McHugh alleged that he linked license plate information of vehicles visiting the residences to people with narcotics history.

98. Det. McHugh alleged he coordinated two controlled drug purchases at the Taylorsville residence using the CI.

99. Det. McHugh alleged that on one occasion at the Taylorsville residence, "The CI proceeded to the location where the CI entered the target location through the south side door leading."

100. Det. McHugh's affidavit does not elaborate as to where the south side door led. The door in fact led to the basement mother-in-law apartment that Italasano had been leasing from Hemingway since May 2015.

101. Det. McHugh alleged that no more than 10 minutes after entering, the CI "exited the house," and returned to a predetermined location having consummated a drug purchase from Italasano.

102. Det. McHugh alleged that on a subsequent occasion, he enlisted the same CI, who consummated a drug purchase from Italasano while in a vehicle outside of the Taylorsville residence.

103. The CI told Det. McHugh that Italasano rented a basement apartment from Trudy Hemingway, yet Det. McHugh's warrant affidavit described the home as a "single family residence."

104. Det. McHugh's affidavit omitted the following:

a. Where the "south side door" led;

b. that the south side door was accessed by way of a worn path, through a gate, down a recessed concrete stairwell, and led into a self-contained mother-in-law apartment;

c. that the apartment included a kitchen, refrigerator, washer and dryer, bathroom, living room, family room and bedroom;

d. that others resided in the main quarters of the residence;

e. whether he had ever observed Italasano associated with members of the Plaintiffs' family or the main living quarters of the residence, including the main street-facing entrance;

f. that he had no information implicating any member of the Plaintiffs' household in criminal activity;

g. whether short-stay traffic included the innocent comings and goings of the Plaintiffs;

h. that numerous other vehicles routinely parked at the Plaintiffs' residence were not associated with Italasano or criminal activity; and

i. that Trudy was the documented owner of the residence.

105. This information was known or readily available to Det. McHugh by virtue of his own observations and those of his CI, yet he omitted it from his warrant application.

**Police Reports**

106. After the search warrant service, Defendant Bradley Bailey wrote in a report that he searched a bedroom in the "basement apartment," which he identified as belonging to Italasano through property in the room and Italasano's statements.

107. Bailey also wrote that he "assisted in searching the kitchen and living area of the basement apartment."

108. Defendant Daniel Morzelewski wrote in a report that "one of the male individuals named Dan was talking about who [sic] the residence was two separate units and they were separated." Morzelewski wrote that "Dan continued to talk about how the house was two separate units and the search warrant was invalid if it was written for the basement unit."

109. Defendant Christopher McHugh wrote in a report that Trudy Hemingway advised him that "she rents part of the basement to the main target Misty Italasano." Det. McHugh wrote that Trudy explained that Italasano's apartment was separated by "an interior door with a lock."

110. Det. McHugh dismissed any concern over the separate units, writing that the door used to separate Italasano's apartment from the Hemingway household was the same type of hollow-core door used for other rooms in the basement.

111. All Defendants involved in the search warrant service attended a pre-warrant briefing on November 4, 2015.

112. During the briefing, it was disclosed that the "upstairs" residents were not suspected of involvement with Italasano's criminal activity, and Plaintiffs Michael McGuire and Trudy Hemingway were specifically identified as upstairs residents.

113. During the briefing, all Defendants present reviewed a copy of the warrant, which did not identify Plaintiffs or note any suspicion as to them or the upstairs portion of the residence.

114. UPD Defendant Bryan Marshall reported that he "assisted clearing the basement apartment. No other persons . . . was [sic] located in the downstairs apartment."

115. UPD Defendant Dan Child reported his assignment as "Basement Apartment Clear Team."

**Cottonwood Heights Police Chief E. Robert "Robby" Russo**

116. Defendant E. Robby Russo has been the Cottonwood Heights chief of police since 2007.

117. Chief Russo has final decision-making authority concerning police operations carried out by officers employed under his command.

118. Chief Russo has implemented a policy and practice that condones and encourages constitutional violations of the very type alleged by Plaintiffs.

119. Chief Russo instructs officers in his employ faced with constitutional search and seizure situations to stop, arrest or search first, and justify the action later.

120. Chief Russo appears to fancy himself the head of an organized crime family, with posters of famous mafia movies like "Casino," "The Sopranos," and "The Godfather," plastering his office walls.

121. Chief Russo commands loyalty and deters whistleblowers by gathering compromising information about his officers and testing the rank and file with questions like, "Are you a rat?"

122. Chief Russo encourages and condones the use of punishments against people who protest against his officers' conduct, such as by exposing detainees to extreme hot

and cold conditions, prolonged detentions while handcuffed, and other painful and humiliating conditions of detention.

123. At the time of these events, Cottonwood Heights had no formal written policy governing the execution of residential search warrants or the conditions under which non-suspect detainees should be treated during such searches.

124. The unconstitutional actions of Defendants were the result of willful and malicious conduct, and/or manifested a knowing and reckless indifference toward, and disregard of the Plaintiffs' rights, and Defendants directly caused the injuries Plaintiffs complain about herein. Furthermore, at all times relevant, Defendants acted under the color of state or federal law. Accordingly, Defendants are liable to Plaintiffs for lost wages and future earnings, property damage expenses, medical expenses, pain and suffering, emotional distress, humiliation, loss of reputation, punitive damages, attorney fees and costs of litigation.

## FIRST CAUSE OF ACTION

### UNCONSTITUTIONAL SEARCH & SEIZURE

(Under 42 U.S.C. § 1983 in Violation of the Fourth Amendment / Article I, Section 14, Against all CHPD and UPD Defendants, & John Does 1 – 20)

125. Plaintiffs incorporate by reference and restate all preceding allegations.

126. Plaintiffs enjoyed the right under the United States and Utah constitutions to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, including the right that a warrant shall not issue, except upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the persons or things to be seized. Defendants violated Plaintiffs' rights to this end.

127. Defendants lacked probable cause or any other quantum of suspicion to believe Plaintiffs were involved in criminal activity.

128. The search warrant and supporting affidavit did not name a single Plaintiff, and it did not note any suspicion of criminal conduct associated with them or *their* home.

129. The warrant was fatally defective because Det. McHugh knowingly, intentionally, and with reckless disregard for the truth, included false statements and material omissions in his affidavit in support of the search warrant.

130. The warrant was also fatally overbroad in that it authorized the search of a multi-unit dwelling, did not distinguish between the units, and police lacked probable cause to believe illegal activity was occurring in each separate unit or that Italasano had dominion and control over the entire building.

131. Det. McHugh materially omitted that the CI informed him Italasano rented a basement apartment from Trudy Hemingway.

132. Det. McHugh falsely stated that the warrant was being sought to search a "single family residence."

133. Det. McHugh falsely stated that he observed the confidential informant enter and then exit the residence on the south side, when the south side entrance is not visible from any public vantage point.

134. Det. McHugh materially omitted that the residents living in the upstairs unit were not suspected of involvement in Italasano's criminal activity.

135. Det. McHugh materially omitted that the "south side door" was accessed by way of a worn path, through a vinyl gate, down a recessed concrete stairwell.

136. Det. McHugh materially omitted that the "south side door" led to a separate basement apartment unit, replete with a kitchen, refrigerator, washer and dryer, bathroom, living room, family room and bedroom, and all other trappings of a separate living unit.

137. Det. McHugh materially omitted that Trudy Hemingway owned the home.

138. Det. McHugh materially omitted that other vehicles regularly parked at the home were not associated with Italasano or criminal activity.

139. Det. McHugh materially omitted that short-stay traffic at the home included Plaintiffs' innocent comings and goings.

140. Det. McHugh intentionally and materially conflated his observations at the Plaintiffs' Taylorsville home with those of the Magna residence where he also suspected Misty Italasano was committing criminal acts.

141. Defendants knew or should have known Plaintiffs were not associated with Misty Italasano beyond their relationship as neighbors and landlord-tenant.

142. All Defendants who attended the pre-warrant briefing knew there was a risk that the warrant was overbroad by permitting the search of a multi-unit dwelling without probable cause as to both units or their residents.

143. All Defendants nonetheless failed to intervene and participated in the unconstitutional search and seizure of Plaintiffs and their home.

144. Defendant Bailey immediately recognized that Italasano lived in a separate "basement apartment," yet he did nothing to intervene and Defendants continued to detain Plaintiffs for hours and search their home.

145. Defendant Morzelewski was told by Plaintiffs that the units were separate, and the warrant therefore invalid, yet he did nothing to intervene and he and Defendants continued to detain Plaintiffs for hours and search their home.

146. Defendant McHugh was also told that the residence contained separate living units, yet he did nothing to intervene, inexplicably deemed this information irrelevant based solely on the composition of a door separating the units, and he and Defendants continued to detain Plaintiffs for hours and search their home.

147. Defendant Bryan Marshall was clearly aware of the separate living units, reporting that he "assisted clearing the basement apartment," yet he did nothing to intervene and he and the other Defendants continued to detain Plaintiffs for hours and search their home.

148. Defendant Dan Child was clearly aware of the separate living units, reporting his assignment as "Basement Apartment Clear Team," yet he did nothing to intervene and he and the other Defendants continued to detain Plaintiffs for hours and search their home.

149. The instant Defendants entered Plaintiffs' home, each knew or should have known that their "target" resided in a separate living unit, and they were therefore obliged to retreat from the search of Plaintiffs' home and release the Plaintiffs.

150. Defendants nonetheless willfully ignored overwhelming evidence that the warrant was overbroad, continued for hours to detain Plaintiffs under humiliating and excruciating conditions, and conducted an invasive search of their home with the aid of a drug-detection canine.

151. Not surprisingly, Defendants' invasive search uncovered no evidence implicating Plaintiffs in criminal activity.

152. Defendant E. Robert "Robby" Russo, as Cottonwood Heights Chief of Police, encouraged and ratified the unconstitutional conduct of Defendants McHugh, Bailey, Bartlett, Morzelewski, Wyatt and other unidentified CHPD employees, by implementing a department-wide policy of approaching search and seizure situations by stopping, arresting or searching first, and justifying the action later—whether legally warranted or not.

153. Plaintiff's suffered flagrant violations of their right to be free from unreasonable searches and seizures under the Utah Constitution, existing remedies under Utah law do not redress their injuries, and equitable relief is wholly inadequate to protect the Plaintiff's rights and redress their injuries to this end.

154. The Utah Governmental Immunity Act immunizes governmental entities and employees from any suit for injury resulting from the exercise of a governmental function, including violations of civil rights. *See* Utah Code §§ 63G-7-201(1), (4).

155. Equitable relief is wholly inadequate to protect the Plaintiffs' rights and redress their injuries, inasmuch as existing state laws provide no penalty for their violation,

failed to deter Defendants' unconstitutional conduct, and explicitly prohibit redress absent a finding of willful misconduct.

156. Defendants' conduct, while acting under color of law, directly caused the deprivation of Plaintiffs' rights to be free from unreasonable searches and seizures under the United States and Utah Constitutions, and all damages resulting therefrom.

## SECOND CAUSE OF ACTION

### EXCESSIVE FORCE/UNNECESSARY RIGOR

(Under 42 U.S.C. § 1983 in Violation of Fourth & Fourteenth Amendments / Article I, Section 9, Against all CHPD and UPD Defendants, & John Does 1 – 20)

157. Plaintiffs incorporate by reference and restate all preceding allegations.

158. Plaintiffs enjoyed the right to be free from excessive force under the Fourth and Fourteenth Amendments, and they enjoyed the right to be free from unnecessary rigor under article I, section 9 of the Utah Constitution. Defendants violated Plaintiffs' rights to this end.

159. Plaintiffs were not suspected of any criminal offense, posed no threat to officer safety and no risk of flight.

160. Defendants nonetheless used explosives and battering rams to invade Plaintiffs home at five different access points, leaving it in shambles upon Defendants' departure.

161. Although Defendants used explosives to destroy two basement windows at Plaintiffs' home, they did not use either window to enter the home.

162. Defendants rousted Plaintiffs at gunpoint, handcuffed them, forced them from their home, and detained them in inhumane conditions for hours.

163. Defendants marched Plaintiffs into the street in temperatures ranging from 33 to 37 degrees Fahrenheit, with winds between four and eight miles per hour, or a wind chill factor of as low as 26 degrees Fahrenheit.

164. Trudy wore nothing but a robe and slippers.

165. Michael wore underclothes, a robe and slippers.

166. Daniel and Aaron were both shirtless and shoeless.

167. Plaintiffs were in these respective states of dress for 30-to-45 minutes in the street, another 30-to-45 minutes in the paddy wagon, an unknown amount of time back in the street, another 20-to-30 minutes in the home with cold air blowing through the breached doors, another 20-to-30 minutes in the garage, and an unknown amount of time back in the house.

168. For at least two hours, Defendants allowed Plaintiffs to shiver violently as their bodies' defense mechanisms kicked in to keep them alive under the excruciatingly cold conditions.

169. Inside the paddy wagon, Plaintiffs asked Defendants to turn on the heat, and Defendants instead turned on cold air for at least five minutes.

170. Defendants denied Trudy's requests for medicine, water, and a step-stool to help her into the paddy wagon despite complaints that she is diabetic and suffers from debilitating knee injuries.

171. Instead of accommodating Trudy's disabilities, Defendants used brute and painful force to get her into and out of the paddy wagon.

172. As Trudy cried out in pain, Defendants wrenched her wrists to put on a new pair of handcuffs, when they knew or should have known the first pair was unjustified.

173. Defendants refused Michael's repeated pleas to use the bathroom, leaving him no option but to urinate in the garage in a bucket, and all over himself, with his family members looking on.

174. Defendants separated Plaintiffs from each other and ordered them to not speak to each other or to police.

175. Defendants sequestered Plaintiffs in the garage and conducted an invasive search of their home using a drug-detection canine.

176. In retaliation for Daniel's protests, Defendants isolated Daniel from his family, held him shirtless and shoeless near the blistering cold of the rear door, and threatened him with arrest if he did not conform his attitude to their liking.

177. All Defendants either participated directly in the excessive force, or failed to intervene despite the obvious constitutional violations occurring.

178. Plaintiffs suffered flagrant violations of their right to be free from unnecessary rigor under the Utah Constitution, existing remedies under Utah law do not redress their injuries, and equitable relief is wholly inadequate to protect the Plaintiff's rights and redress their injuries to this end.

179. The Utah Governmental Immunity Act immunizes governmental entities and employees from any suit for injury resulting from the exercise of a governmental function, including violations of civil rights. *See* Utah Code §§ 63G-7-201(1), (4).

180. Equitable relief is wholly inadequate to protect the Plaintiffs' rights and redress their injuries, inasmuch as existing state laws provide no penalty for their violation, failed to deter Defendants' unconstitutional conduct, and explicitly prohibit redress absent a finding of willful misconduct.

181. Defendants' treatment of Plaintiffs during their detention was needlessly and excessively harsh, degrading, dehumanizing, restrictive, violent, and humiliating, directly causing the deprivation of Plaintiffs' rights to be free from excessive force and unnecessary rigor, and damages resulting therefrom.

## THIRD CAUSE OF ACTION

**FREE SPEECH, EXPRESSION, PROTEST & DEFENSE OF LIFE & LIBERTY**

(Under 42 U.S.C. § 1983 in Violation of the First Amendment, Article I, Section 1, Against Defendants and John Does I – XX)

182. Plaintiffs incorporate by reference and restate all preceding allegations.

183. Daniel McGuire enjoyed the right under the First Amendment to verbally oppose the officers' conduct without thereby risking arrest or punishment, even if his speech was annoying, offensive, provocative or challenging.

184. Daniel also enjoyed the inalienable rights under article I, section 1 of the Utah Constitution to defend his life and liberty, protest against wrongs and communicate freely his thoughts and opinions.

185. Defendants violated these clearly established rights by punishing and threatening to punish Daniel for exercising his speech and protest rights.

186. In response to Daniel's protected conduct, Defendants separated Daniel from his family, forced him shirtless and shoeless to be lectured near an open door, exposed

him to freezing temperatures, and threatened to arrest him if he did not change his attitude.

187. Not surprisingly, the punishment and threats of more punishment had the desired effect of squelching Daniel's speech—he immediately ceased his criticism of Defendants' conduct.

188. All Defendants who either participated directly in threatening to punish Daniel for exercising his rights to express himself, or who witnessed the obvious constitutional violation and failed to intervene, are liable for the violation.

189. Plaintiff Daniel McGuire suffered flagrant violations of his rights to defend his life and liberty, protest wrongs, and freely communicate his thoughts and opinions under the Utah Constitution.

190. Existing remedies under Utah law do not redress his injuries.

191. Equitable relief is wholly inadequate to protect McGuire's rights and redress his injuries to this end.

192. The Utah Governmental Immunity Act immunizes governmental entities and employees from any suit for injury resulting from the exercise of a governmental function, including violations of civil rights. *See* Utah Code §§ 63G-7-201(1), (4).

193. Equitable relief is wholly inadequate to protect McGuire's rights and redress his injuries, inasmuch as existing state laws provide no penalty for their violation, failed to deter Defendants' unconstitutional conduct, and explicitly prohibit redress absent a finding of willful misconduct.

194. Defendants' conduct directly caused the deprivation of Daniel's rights to free speech and expression under the First Amendment and article I, section 1 of the Utah Constitution, and caused all damages arising therefrom.

## FOURTH CAUSE OF ACTION

### MUNICIPAL LIABILITY

(Under 42 U.S.C. § 1983, Unconstitutional Policy and Practice in Violation of Fourth Amendment Against Cottonwood Heights and Unified Police Department)

195. Plaintiffs incorporate by reference and restate all preceding allegations.

196. Cottonwood Heights bears municipal liability for the unconstitutional conduct of all of its employees who participated in the warrant service and detention of Plaintiffs.

197. Cottonwood Heights Police Chief E. Robert "Robby" Russo has implemented a policy and practice that condones and encourages constitutional violations of the very type at issue here.

198. At the time of the raid, Cottonwood Heights had no formal written policy governing the military-style execution of residential search warrants, and it had no formal written policy governing the treatment of non-suspect detainees.

199. Chief Russo instructs officers faced with constitutional search and seizure situations to stop, arrest or search first, and justify the action later.

200. Chief Russo reportedly fancies himself the leader of an organized crime family, with posters of famous mafia movies plastering his office walls.

201. Chief Russo commands loyalty and deters whistleblowers by gathering compromising information about his officers and testing the rank and file with questions like, "Are you a rat?"

202. Chief Russo's well-settled policy, practice and instruction to officers to stop, arrest or search first, and justify the action later, is part and parcel of the constitutional violations at issue here.

203. Defendant Det. McHugh fudged, misrepresented, omitted, and ignored overwhelming evidence—prior to and during the raid—that the Plaintiffs and their home had nothing to do with Misty Italasano's alleged criminal activity.

204. Defendant Morezelewski also ignored overwhelming evidence that the warrant and the search were overbroad, yet quickly dismissed those concerns when raised, and continued to search and detain the Plaintiffs.

205. It was immediately clear to Defendant Bailey that he was searching a separate "basement apartment," yet he did nothing to intervene in the unlawful detention and search of Plaintiffs and their home.

206. Upon information and belief, the other Defendants also knew or should have known the search was unconstitutionally overbroad, yet did nothing to intervene in the unlawful detention and search of Plaintiffs due to Cottonwood Heights' policy and practice of ignoring such concerns.

207. Defendants' rank indifference to Plaintiffs' rights was at least closely related to, if not a direct result of, Chief Russo's longstanding policy, practice and direction to officers to stop, arrest, or search first, and justify the action later.

208. Accordingly, Cottonwood Heights bears municipal liability for the search and seizure violations committed by the Defendants it employed, inasmuch as the municipal policy directly caused, or was closely related to, the Fourth Amendment violations and resulting injuries suffered by Plaintiffs.

## FIFTH CAUSE OF ACTION

### MUNICIPAL LIABILITY

(Under 42 U.S.C. § 1983, Failure to Train in Violation of Fourth & Fourteenth Amendment, Against Cottonwood Heights, Unified Police Department)

209. Plaintiffs incorporate by reference and restate all preceding allegations.

210. Defendants' lack of training, or deficient training, was directly and causally linked to the excessive force Defendants used against Plaintiffs.

211. Cottonwood Heights had no formal written policy governing its employees in the lawful acquisition and execution of residential search warrants or in detaining non-suspects during such warrant services.

212. Cottonwood Heights was deliberately indifferent to the substantially certain, highly predictable, and plainly obvious consequences of failing to train its employees on the legal requirements for obtaining and executing a residential search warrant.

213. Unified Police Department had an inadequate policy for governing its employees' conduct during execution of residential search warrants, inasmuch as that policy was silent on the abuses that occurred here.

214. Specifically, UPD's policy does not instruct its employees to identify an overbroad warrant, to retreat from executing an overbroad warrant, or to treat non-suspect detainees humanely during a warrant service.

215. Law enforcement agencies routinely execute forcible entry search warrants on multi-unit residential dwellings.

216. The decisions and tactics employed to forcibly execute search warrants present an obvious potential for the abuses Plaintiffs complain of here.

217. Law enforcement agencies routinely detain suspects and other people while executing search warrants, sometimes for protracted periods, in any number of environmental conditions, and involving people with medical conditions and normal anatomical requirements.

218. The conditions under which suspects and detainees are held present an obvious potential for the types of abuses and deprivations Plaintiffs suffered at the hands of Defendants, as do the conditions of a military-style warrant execution.

219. Defendants were deliberately indifferent to these concerns when they unnecessarily used explosives to destroy windows in bedrooms where Plaintiffs were sleeping or might have been sleeping; exposed Plaintiffs' for hours to freezing temperatures—as punishment, in at least one instance—without suitable clothing; used brute force in handling Plaintiffs while handcuffing them and placing them in the paddy wagon; and refused to provide Plaintiffs with medicine, medical care, medical accommodations, water, clothing, shelter, or even access to a restroom.

220. McHugh, Bailey, Bartlett, Morzelewski, and Wyatt were so indifferent to the conditions of the Plaintiffs' detention, their reports contain nary a mention of these conditions—the explosives, the assault weapons, the "army men," the apartment door that vanished, the temperature, the duration of the detention, the exchange of

handcuffs, Trudy's requests for medicine, water and a step-stool, Michael's requests to use the bathroom, the detention in the paddy wagon, the air-conditioning, or Daniel's isolation and punishment for speaking out.

221. The lack of training and deliberate indifference of their employees demonstrate that Cottonwood Heights and Unified Police Department were also deliberately indifferent to the Plaintiffs' basic dignity as human beings, and this lack of training was causally linked to the deprivation of Plaintiffs' rights to be free from excessive force.

222. Cottonwood Heights and Unified Police Department failed to adequately train their employees in the crucial areas of policing noted here, and these failures directly caused the search and seizure violations and excessive uses of force described here and the damages resulting therefrom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants as follows:

1. A declaration that Defendants' acts and practices violated Plaintiffs' rights under the Utah and United States constitutions;

2. A permanent injunction against Defendants restraining them from committing such unconstitutional acts going forward, as well as affirmative relief directing Defendants to take such action as is necessary to eliminate similar violations going forward;

3. Compensatory and consequential damages in an amount to be determined at trial;

4. Punitive damages on all claims allowed by law, in an amount to be determined at trial;

5. Reasonable attorney fees and the costs of litigation; and

6. All other relief this Court deems just and equitable.

RESPECTFULLY SUBMITTED on this 28th day of December, 2016.

*/s/ R. Shane Johnson*
R. Shane Johnson
*Attorney for Plaintiffs*

# CERTIFICATE *of* SERVICE

On the 28th day of December, 2016, a true and correct copy of the foregoing Amended Complaint was served by the method indicated below, and addressed to the following:

| | |
|---|---|
| J. Michael Hansen<br>8941 S. 700 East, Suite 203<br>Sandy, UT 84070<br>801.981.8779<br>*Attorney for Cottonwood Heights, et al.* | ☐ Hand Delivery<br>☒ U.S. Mail<br>☐ Overnight Mail<br>☐ Facsimile<br>☒ e-Mail |
| Scott Young<br>10 Exchange Place, 11th Floor<br>Salt Lake City, UT 84111<br>801.322.0400<br>*Attorney for Unified Police Dept., et al.* | ☐ Hand Delivery<br>☒ U.S. Mail<br>☐ Overnight Mail<br>☐ Facsimile<br>☒ e-Mail |

/s/ R. Shane Johnson