IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TRUDY HEMINGWAY, *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>E. ROBERT RUSSO, *et al.*,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:16-cv-00313<br><br>District Judge Jill N. Parrish |

Before the court are cross-motions for summary judgment. The first (ECF No. 43) was filed on December 15, 2017 by defendants Bradley Bailey, Daniel Bartlett, Cottonwood Heights City, Christopher McHugh, Daniel Morzelewski, Robert Russo, and Kevin Wyatt (collectively, "Defendants"). The second (ECF No. 44) was filed on the same day by plaintiffs Aaron Christensen, Trudy Hemingway, Daniel McGuire, and Michael McGuire (collectively, "Plaintiffs"). For the reasons below, Defendants' motion is granted in part and denied in part, and Plaintiffs' motion is denied.

## I.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if "a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014). "In making this determination," the court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* (citation omitted).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). This burden is a heavy one. *See Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). And qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In qualified immunity cases, the requirement that the court view the evidence and draw inferences in the light most favorable to the nonmoving party "usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

When both parties move for summary judgment, the court must analyze each motion individually and on its own merits. *See Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). Consequently, the court considers Defendants' motion under the qualified immunity analysis before turning to Plaintiffs' motion.

## II.    FACTS

The following recitation of facts adopts Plaintiffs' version of events to the extent that their story finds support in the record.

### A.  THE TAYLORSVILLE RESIDENCE

Trudy Hemingway owns a home in Taylorsville, Utah (the "Taylorsville Residence"). In 2015, the Taylorsville Residence was listed on Salt Lake County records as a single-family residence. It had one mailbox, one street address, and one set of utilities. The City of Taylorsville had no record of there being separate apartments in the home. And Hemingway had not obtained

a building permit to convert part of the home into apartments, nor had she informed anyone with the City of Taylorsville about any apartments at her home.

Nevertheless, in late 2015, the home was, in fact, home to more than one family. Ms. Hemingway and her adult sons Aaron Christensen and Michael McGuire lived on the main level. Hemingway's adult son Daniel McGuire lived in a portion of the basement. And a woman named Misty Italasano rented another portion of the basement from Hemingway.

Italasano's basement residence was separated from the rest of the Taylorsville Residence by a door, in front of which Italasano had placed several items of furniture. That door remained closed and locked by a double-sided deadbolt that required a key to be unlocked from either side. Hemingway had the only key. The only other entrance to Italasano's residence was an exterior basement door opening to a set of stairs on the side of the house.

### B. INVESTIGATION OF MISTY ITALASANO

In October 2015, a confidential informant told Detective Christopher McHugh of the Cottonwood Police Department that Italasano was selling methamphetamine out of the Taylorsville Residence. The informant told McHugh that Italasano lived in the basement of the home, and the informant described the basement as containing "a small kitchen on the left, a bedroom on the right, and then multiple doors . . . in the backside of the basement."

The informant also told McHugh that James Andrew Carter and Greg Magalogo were associated with Italasano. Carter was a convicted felon and a federal fugitive with an outstanding national warrant for his arrest on a weapons charge. Magalogo was also a convicted felon with a history of assault involving firearms.

For approximately one month, McHugh conducted surveillance on the Taylorsville Residence. During that time, McHugh surveilled the home almost daily on weekdays— sometimes for a few minutes, sometimes for a few hours. In the course of his surveillance,

McHugh recorded and investigated as many license plates as possible from vehicles parked at the residence or nearby. He discovered that some of the vehicles belonged to Hemingway and her sons. And, working with the Unified Police Department ("UPD"), McHugh determined that Hemingway owned the home and that police had been called there for minor complaints in the past.[1]

While surveilling the Taylorsville Residence, McHugh observed Italasano, Magalogo, and Carter coming and going. Once, somewhere in the middle of his month of surveillance, McHugh watched Italasano enter the front door and then exit about ten minutes later. But on all other occasions, Italasano and those accompanying her entered by walking through the side gate on the left side of the house, down the steps, and into the basement where she lived.

Beyond Italasano, McHugh knew there were other residents in the building, including at least Hemingway and Michael McGuire. McHugh also observed younger men who were not suspected in drug activity coming and going through the front entrance. He did not observe any of these individuals use the basement door that Italasano used.

On two occasions, McHugh used his confidential informant to conduct controlled drug purchases at the Taylorsville Residence. On the first buy, the informant entered the building by walking through the side gate, down the steps, and then through the basement door. On the second buy, the informant parked in front of the residence. McHugh observed Italasano come up the stairs, exit through the side gate, and approach the car.

Throughout McHugh's surveillance, he observed what he calls "short-stay traffic." People would approach the home, go through the side gate, down the stairs, and into the

---

[1] There is no evidence that the past complaints were related to drug activity.

basement. They would stay "for two to three minutes, usually less than five minutes," and then exit, walk up the stairs, go back through the side gate, re-enter their vehicle, and leave.

In short, while several factors suggested to McHugh that the building was a single-family residence, there were other significant indicia that the building was a multifamily residence and that Italasano was actually living in a basement apartment.

## C. SEARCH WARRANT AFFIDAVIT

On October 30, 2015, McHugh submitted an affidavit for a warrant to search the Taylorsville Residence. In the affidavit, McHugh characterized the Taylorsville Residence as "a single family residence." He described people entering the residence for short periods of time and then exiting. He also described instances where vehicles would approach the residence and Italasano would exit and make contact with the vehicles' drivers. McHugh's affidavit indicated that he was "able to gather license plate information [from] the vehicles coming and going from the residence[,] and they were connected to people with narcotics history." McHugh's affidavit identified Magalogo, indicated he was staying with Italasano at the Taylorsville Residence, and described him as "a known gang enforcer for a Polynesian gang" with "multiple convictions for aggravated assault and felon in possession of a dangerous weapon." The affidavit recounted the controlled buys and then requested a search warrant for the "suspected place," which included "the entire premise and curtilage at that location."

McHugh's affidavit is notable for what it did not include. It omitted entirely any indication that Hemingway and her sons lived at the Taylorsville Residence. It also omitted any indication that Italasano's basement residence was a separate unit. Specifically, the affidavit omitted the following information known to McHugh:

1. Trudy Hemingway owned the Taylorsville Residence.

2. Hemingway lived in the Taylorsville Residence.

3. Hemingway's adult son Michael McGuire also lived in the Taylorsville Residence.

4. The building had two apparent and well-used entrances: one in the front, and one through a side gate and down a set of concrete stairs.

5. Italasano was living in the basement. McHugh observed her entering via the front door on only one occasion, and she exited again after ten minutes. Otherwise, Italasano used the basement door exclusively.

6. Magalogo was living in the basement. McHugh never observed him entering or exiting via the front door.

7. The basement where Italasano and Magalogo lived included a kitchen and a bedroom.

8. McHugh conducted surveillance for nearly a month.

9. During his surveillance, McHugh saw individuals he did not suspect of drug-related activity coming and going through the front door. McHugh did not observe the same individuals using the basement door.

10. Several of the vehicles parked near the residence were registered to Hemingway and her sons.

11. McHugh did not suspect Hemingway or her sons of involvement in Italasano's criminal activity.

12. All short-stay traffic related to suspected criminal activity was to the basement—not the main floor.

13. When Italasano would leave the Taylorsville Residence to conduct suspected drug transactions in front of the Taylorsville Residence, she would exit from (and return to) the basement.

In short, McHugh's affidavit did not include any information that would have suggested that anyone other than Italasano and Magalogo lived at the Taylorsville Residence. One incomplete sentence in the affidavit, if completed, might have indicated that Italasano was just one of several residents or that she lived in a separate unit: Describing the first controlled buy, McHugh declared, "The CI [Confidential Informant] proceeded to the location where the CI entered the target location through the south side door leading." McHugh watched his informant walk through the side gate, down a set of stairs, and into the basement. But his affidavit inexplicably and jarringly omitted where, exactly, the south side door led. It led to Italasano's basement home—a fact McHugh knew when he drafted the affidavit.

After McHugh prepared his affidavit, he delivered it to then-Sergeant Daniel Bartlett, who reviewed it. Bartlett and McHugh discussed the nature of the residence and the possibility of separate living spaces. Bartlett learned from McHugh that Italasano rented a portion of the basement and that Hemingway and her sons lived elsewhere in the home. He learned that, with one exception, Italasano had been seen going in through the side gate and to the basement. He learned that Hemingway and her sons were not suspected in the criminal activity McHugh was investigating.

Despite their discussion regarding other residents and separate living spaces, Bartlett suggested no changes to McHugh's affidavit. Instead, the affidavit was passed along to a district attorney absent any reference to other residents at the address or any indication of separate living spaces. The district attorney also suggested no revisions to the affidavit.

On October 30, 2015—the same day McHugh submitted the affidavit—Justice Court Judge Jeanne M. Robison issued a search warrant. That warrant commanded officers to search, day or night, without knocking, "the premises known as 4796 S 3475 W, Taylorsville, Utah,

84129." The warrant described the premises as "a single family residence, with tan vinyl siding, a rock facia [sic], and brown shingle roof." And it explained that "[t]he suspected place also includes the entire premises and curtilage at that location, including all outbuildings, sheds, and vehicles found to be under the control of [Italasano] in which evidence sought under this warrant could be hidden."

### D. THE SEARCH

Before executing the search warrant, McHugh and Bartlett briefed UPD officers. McHugh described his investigation and related the information contained in the warrant. He identified Italasano, Magalogo, and Carter as "suspects," and Hemingway and Michael McGuire as "subjects." McHugh and Bartlett discussed the presence of Hemingway and her sons, explaining to the UPD officers that they believed the family was not involved in Italasano's criminal activity.

Then, in the wee hours of November 4, 2015, the UPD SWAT team used an explosive charge on the basement entrance and a battering ram on the front door. In short order, the SWAT team rounded up, handcuffed, and detained Hemingway and her sons: Aaron, Daniel, and Michael. They also handcuffed Italasano and Charish Wakefield, a woman who had been staying with Italasano. After securing the home, the UPD turned the scene over to Cottonwood Heights police.

Thereafter, Cottonwood Heights police officers played various roles. Officer Daniel Morzelewski took custody of Italasano and Wakefield. Then he escorted one of the women (presumably Wakefield) back to the house. From there, Morzelewski entered the main level of the Taylorsville Residence, where he helped take custody of Plaintiffs. At some point, Daniel McGuire told officers that he lived in the basement but that Italasano lived in a separate basement unit. Curious, Morzelewski walked down a set of stairs and through several basement

8

rooms. It is unclear whether Morzelewski was able to access Italasano's portion of the basement via the internal stairway.

Officer Bradley Bailey searched the basement apartment where Italasano lived.

Officer Kevin Wyatt photographed the scene and took possession of the evidence. Wyatt's photographs make it clear that Italasano's basement home included a kitchen with a washer/dryer, a dishwasher, a range/oven, a refrigerator, kitchen cabinetry, an island, a microwave, and a sink. They also show a cluttered living room, a full bathroom, and a bedroom.

Bartlett and McHugh arrived at the scene just as the UPD was turning the scene over to Cottonwood Heights police. Bartlett walked around the home, saw that Italasano was in custody, and concluded that Hemingway and her sons were not involved in Italasano's criminal activity. Still, Bartlett and McHugh kept Plaintiffs in handcuffs while police searched both the main level and both portions of the basement. At some point, Italasano told Bartlett that she rented a room from Hemingway and that she had "her own little apartment," and Hemingway told McHugh that Italasano rented a portion of the basement and that Italasano's residence was separated from the rest of the home by an interior door with a lock. McHugh verified the existence of such a lock. Eventually, Bartlett ordered that Hemingway's handcuffs be removed. But he kept her sons in handcuffs and moved the whole family from the living room to the garage while another officer walked a drug-sniffing canine through their home.

### III.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY

Plaintiffs bring five causes of action for alleged civil rights violations under federal and state law: (1) illegal search and seizure by the individual defendants; (2) excessive force and unnecessary rigor by the individual defendants; (3) violation of the right to free speech by all

defendants; (4) municipal liability by Cottonwood Heights for the conduct alleged in Claim I; and (5) municipal liability by Cottonwood Heights for the conduct alleged in Claim II.[2]

Defendants argue that they are entitled to summary judgment on Plaintiffs' first, second, and third causes of action on the basis of qualified immunity. In response, Plaintiffs concede their second, third, fourth, and fifth causes of action. Consequently, the question presented by Defendants' motion is relatively straightforward: Are the individual defendants entitled to qualified immunity as to Plaintiffs' first cause of action for an unconstitutional search and seizure? [3]

---

[2] Plaintiffs have resolved their claims against the UPD. Consequently, none of the remaining defendants in this action are UPD officers. Rather, Plaintiffs' surviving claims are against Cottonwood Heights officers (who were involved in obtaining the search warrant and who took over the scene after the UPD SWAT team breached the home), the Cottonwood Heights police chief, and the city itself.

[3] In addition to qualified immunity, Defendants also argue that they are entitled to summary judgment on the basis of judicial immunity and quasi-judicial immunity. *Defs.' Mot. Summ. J.* 3, ECF No. 43. But judicial immunity and quasi-judicial immunity are forms of absolute immunity—an affirmative defense that must be pleaded. *Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994). Defendants did not plead absolute immunity, so they have waived that defense. Fed. R. Civ. P. 8(c); 5 Fed. Prac. & Proc. Civ. § 1278 (3d ed.). Even if they had pleaded absolute immunity, neither theory of immunity applies here.

Judicial immunity is an absolute immunity from suit for acts performed in a judge's judicial capacity. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). Clearly, none of the defendants in this case were acting in a judicial capacity.

Quasi-judicial immunity is an extension of judicial immunity to non-jurists "for acts intertwined with the judicial process." *Valdez v. City and Cty. of Denver*, 878 F.2d 1285, 1287 (10th Cir. 1989). But it does not extend to officers applying for search warrants. *See Malley v. Briggs*, 475 U.S. 335, 343 (1986) (holding that officers requesting warrants are entitled only to qualified immunity and noting that, "[i]n the case of the officer applying for a warrant, it is our judgment that the judicial process will on the whole benefit from a rule of qualified rather than absolute immunity"). Quasi-judicial immunity also does not extend to officers executing those warrants during the investigative phase of the criminal process. *See Imbler v. Pachtman*, 424 U.S. 409, 430 (1976) (noting that officials involved in investigative activities do not enjoy absolute immunity because covered activities must be "intimately associated with the judicial phase of the criminal process"); *Scott v. Hern*, 216 F.3d 897, 908 (10th Cir. 2000) ("Absolute immunity does not extend to actions that are primarily investigative or administrative in nature . . . ."); *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1991) ("Thus, the more distant a function

The court first addresses alleged constitutional violations regarding the search warrant affidavit submitted by McHugh. Then it turns to alleged constitutional violations regarding Bartlett's review of the affidavit. Finally, the court considers alleged constitutional violations regarding the search and seizure by Bartlett, McHugh, Morzelewski, Bailey, and Wyatt.

## A. MCHUGH'S AFFIDAVIT

Plaintiffs take issue with two aspects of McHugh's affidavit. First, they contend that McHugh made a false statement in the affidavit when he described the residence as "a single family residence." Second, they contend that McHugh deliberately omitted information from the affidavit that tended to show that the residence was not a single-family residence. Plaintiffs believe that McHugh's actions violate their Fourth Amendment rights (as applicable to the states through the Fourteenth Amendment) because if this information had been included, and the false statement amended, there would not have been probable cause to search Plaintiffs' living area.

### 1. Whether McHugh Violated a Constitutional Right

First, the court must consider whether McHugh violated Plaintiffs' Fourth Amendment rights. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

A person's Fourth Amendment rights are violated when an officer: (1) deliberately or recklessly makes false statements or omissions in a warrant affidavit, and (2) correcting the false statements or including the omissions would have vitiated probable cause. *Stewart v. Donges*,

---

is from the judicial process and the initiation and presentation of the state's case, the less likely it is that absolute immunity will attach.").

915 F.2d 572, 582–83 (10th Cir. 1998); *see also Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

McHugh described the Taylorsville Residence as "a single family residence." Plaintiffs argue this was an intentional, knowing, or reckless misstatement. There is significant evidence in the record to support Plaintiffs' assertion that McHugh knew (or at least inferred) that the Taylorsville Residence was not a single-family residence. Consequently, for purposes of Defendants' motion, the court adopts Plaintiffs' version of the facts and assumes McHugh knew that the Taylorsville Residence was, in fact, a multifamily dwelling. Therefore, describing the home as "a single family residence" in the affidavit constituted a knowing and intentional misstatement.

Even if McHugh did not make the false statement knowingly and deliberately, there is evidence in the record to support the finding that he acted with a reckless disregard for the truth. "A reckless disregard for the truth exists when the affiant in fact entertained serious doubts as to the truth of his allegations, and a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990) (citations and alterations omitted). In this case, McHugh's month-long surveillance of the Taylorsville Residence evinced obvious reasons to doubt the veracity of McHugh's sworn statement that the Taylorsville Residence was a single-family residence: Hemingway and Michael McGuire's residence in the building and their exclusive use of the front door; Italasano's near-exclusive use of the basement door; short-stay traffic related to suspected drug transactions taking place exclusively in the basement; the CI's report of the basement layout; and the two drug buys (one in the basement and one where Italasano exited from the basement to complete the transaction).

In addition to the alleged misstatement, McHugh also omitted all indicia of separate residences. Nowhere in his affidavit did he mention Hemingway or her sons. Nowhere did he indicate that there were two well-used entrances to the Taylorsville Residence. Nowhere did he disclose that Italasano and Magalogo, the subjects of his investigation, used only one of those entrances to conduct suspected drug transactions. McHugh's affidavit, viewed in the light most favorable to Plaintiffs, seems specifically crafted to mislead the magistrate. An otherwise uninformed reader perusing the affidavit would be led to believe that Italasano and Magalogo had the run of the Taylorsville Residence, that they were the sole residents, and that the CI conducted a controlled buy and simply entered the building through the south side door. From the affidavit, the magistrate had no reason to suspect that there was anyone other than a notorious drug dealer and a violent ex-con living at the Taylorsville Residence. But McHugh knew otherwise. He knew there were unsuspected individuals living in the home. He had never seen them use the basement entrance. He had never seen a suspected or confirmed drug transaction involving the main floor. Yet he failed to disclose any of this information to the magistrate.

These facts suggest that McHugh's omissions were knowing and deliberate. He did not accidentally forget to include the name of the building's owner and primary resident. He did not simply happen to leave the Hemingway family out of his affidavit and then, days later, brief the UPD regarding an entire family unsuspected of criminal activity.

And even if McHugh's omissions were not made knowingly, a jury could conclude they were made recklessly. The Fourth Amendment "categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting U.S. Const. amend. IV). "The manifest purpose of this particularity requirement was to prevent general searches." *Id.* By

omitting what he did from his affidavit, McHugh presented to the magistrate a picture of an entire building being used for drug trafficking, when the evidence available to him suggested only a portion of the building being used for that purpose. A reasonable person would know these omissions involved the type of information a magistrate would wish to know when considering a search warrant. *See Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) (citing *Wilson v. Russo*, 212 F.3d 781, 787–88 (3d Cir. 2000) (holding that "omissions are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know")); *see also DeLoach*, 922 F.2d at 622 ("Recklessness may be inferred from omission of facts which are 'clearly critical' to a finding of probable cause.") (citing *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990); *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).

McHugh knowingly or recklessly made a misstatement and omissions. But would amending and including McHugh's false statement and omissions have vitiated probable cause to search the entire Taylorsville Residence? When false statements are involved, "the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." *Grubbs v. Bailes*, 445 F.3d 1275, 1278 (10th Cir. 2006) (quoting *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996)). "Where information has been omitted from an affidavit, we determine the existence of probable cause by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." *Id.* (quoting *Taylor*, 82 F.3d at 1562). "But whether we're talking about acts or omissions the judge's job is much the same—we must ask whether a warrant would have issued in a but-for world where the attesting officer faithfully represented the facts." *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015).

14

Simply put, the question is whether, with a remedied affidavit, there still existed "a fair probability that contraband or evidence of a crime [would] be found in a particular place." *United States v. Carter*, No. 06-20073, 2007 WL 60937, at *5 (D. Kan. Jan. 8, 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). However, in a civil rights suit like this one, whether there was probable cause is a question of fact when there is room for disagreement. *See DeLoach*, 922 F.2d at 623 (noting that the Tenth Circuit has "long recognized that it is a jury question in a civil rights suit whether an officer had probable cause to arrest"); *see also Stringer v. Dilger*, 313 F.2d 536, 541 (10th Cir. 1963); *Marland v. Heyse*, 315 F.2d 312, 314 (10th Cir. 1963); *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985) ("It is true that the issue of probable cause ordinarily is for the judge rather than the jury. . . . But where the issue arises in a damage suit, it is . . . a proper issue for the jury if there is room for a difference of opinion.") (en banc) (considering probable cause to search). Had McHugh submitted a remedied affidavit, it is clear there still would have been a fair probability that contraband and other evidence of criminal conduct would be found in Italasano's basement home. However, "[t]he fourth amendment requires not only that [a] warrant sufficiently specify the evidence to be seized, but also that the scope of the warrant be limited to the specific areas and things for which there is probable cause to search." *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988). There is room for a difference of opinion regarding whether a remedied affidavit would have demonstrated probable cause to search the rest of the Taylorsville Residence. Consequently, construing facts in Plaintiffs' favor, the court must conclude that McHugh's false statements and omissions, if amended and included, would have vitiated probable cause to search the main floor of the Taylorsville Residence. Therefore, the misstatement and omissions were material, and Plaintiffs have established that McHugh violated their Fourth Amendment rights.

### 2. Whether the Right Plaintiffs Assert was Clearly Established

Because Plaintiffs have established that McHugh violated a constitutional right, the court must consider whether that right was clearly established.

"The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Dodds v. Richardson*, 614 F.3d 1185, 1206 (10th Cir. 2010) (citing *Harman v. Pollock*, 586 F.3d 1254, 1261 (10th Cir. 2009) ("*Harman I*"). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

The Supreme Court has repeatedly warned courts not to "define clearly established law at a high level of generality." *Id.* (internal quotation marks omitted). This is especially true "in the Fourth Amendment context, where the Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (internal quotation marks omitted). Still, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted).

McHugh submitted his affidavit in late 2015. By that time, the *Franks* holding was more than thirty-five years old. And the Tenth Circuit's holding in *Stewart* was more than fifteen years old. Both cases are on point, and both establish that material false statements and omissions in a warrant affidavit, made knowingly and intentionally or with a reckless disregard for the truth, violate the Fourth Amendment. *See Franks*, 438 U.S. at 155–56; *Stewart*, 915 F.2d at 583–83.

As the court noted above, clearly-established law should not be defined at a high level of generality. *Mullenix*, 136 S. Ct. at 308. But that principle does not require the existence of a Tenth Circuit or Supreme Court case involving precisely the misstatement and omissions at issue here. Instead, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. And "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Handy v. City of Sheridan*, 636 F. App'x 728, 738 (10th Cir. 2016) (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)). Indeed, in considering the clearly-established-law prong in qualified immunity cases under *Franks* and *Stewart*, the Tenth Circuit does not consider whether it was clearly established that *particular* misstatements or omissions violated plaintiffs' rights. Instead, it considered (more broadly) whether *material* misstatements and omissions violate plaintiffs' rights. *See, e.g.*, *Salmon v. Schwarz*, 948 F.2d 1131, 1139 (10th Cir. 1991) (material omissions from an arrest affidavit); *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004) (falsification of evidence post-arrest).

Here, a reasonable official would have understood from *Franks* and *Stewart* that drafting a search warrant affidavit for the Taylorsville Residence with the material misstatement and omissions noted above violated Plaintiffs' rights. Consequently, McHugh is not entitled to qualified immunity from suit under § 1983 for submitting a misleading affidavit.

### B. Bartlett's Review of McHugh's Affidavit

As McHugh's superior officer, Bartlett reviewed the affidavit before its submission. Plaintiffs argue that Bartlett is also liable for violations of the Fourth Amendment because he reviewed the affidavit but failed to prevent the harm caused by McHugh's false statement and omissions.

### 1. Whether Bartlett Violated a Constitutional Right

First, the court must consider whether Bartlett violated Plaintiffs' constitutional rights. The Tenth Circuit has instructed:

> [A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official.

*Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id.* (quoting *Anderson*, 17 F.3d at 557).

As the court has already explained, a reasonable jury could find that McHugh knowingly or recklessly made a material misstatement and material omissions in the affidavit. Bartlett reviewed the affidavit and knew it did not fully reflect McHugh's understanding of the Taylorsville Residence. Bartlett knew there were other individuals residing in the home. He knew they were not suspected in the crimes McHugh was investigating. He and McHugh even discussed the possibility that the home contained separate living spaces. Bartlett was so convinced the Hemingway family was not involved that he and McHugh also discussed the family's presence at length with the UPD before executing the warrant.

Bartlett had reason to know that McHugh had committed a constitutional violation in how he drafted the affidavit. Bartlett also had a realistic opportunity to intervene and require McHugh to draft an accurate affidavit—one that did not omit or misstate material facts. Despite his knowledge and opportunity, Bartlett did nothing to intervene. His failure to intervene makes him potentially liable for the preventable harm caused by McHugh's actions.

## 2. Whether the Right Plaintiffs Assert was Clearly Established

Because Plaintiffs have established that Bartlett violated a constitutional right, the court must consider whether that right was clearly established.

As early as 1984, the Tenth Circuit made it clear that law enforcement officials who fail to intervene to prevent constitutional violations by another officer may be liable under § 1983. In *Lusby v. T.G. & Y. Stores, Inc.*, the Tenth Circuit reached that conclusion in circumstances involving an excessive force claim. 749 F.2d 1423, 1433 (10th Cir. 1984). And in *Mick v. Brewer*, the court held that "the law was clearly established that a law enforcement official has an affirmative duty to intervene to prevent another law enforcement official's use of excessive force" before June 18, 1992. 76 F.3d 1127, 1136 (10th Cir. 1996).

In *Hall v. Burke*, the Tenth Circuit noted that officers' affirmative duty to intervene is not limited to the excessive force context:

> [I]t is clearly established "that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, <u>or (3) that any constitutional violation has been committed by a law enforcement official [.]</u> In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."

12 F. App'x 856, 861 (10th Cir. 2001) (emphasis added) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted)). The broad language of *Hall* makes it clear that officers who fail to intercede are liable when those officers observe or have reason to know that *any* constitutional violation has been committed by a law enforcement official.

As the court has already explained, it was clearly established that material misstatements and omissions, made in a warrant affidavit, violated Plaintiffs' Fourth Amendment rights. Bartlett knew that Hemingway and at least one of her sons lived at the Taylorsville Residence. He knew they were not suspected of involvement with Italasano's alleged criminal activity. He was aware that there might be separate living units in the Taylorsville residence. But the affidavit he reviewed stated, without reservation, that the building was a single-family residence, and it omitted entirely any mention of other, unsuspected occupants. Upon reading McHugh's drafted affidavit, Bartlett had reason to know that McHugh had misstated and omitted material information. Any reasonable officer, knowing what Bartlett knew, would have known it was his duty to intervene. Therefore, Bartlett is not entitled to qualified immunity.

## C. SEARCH AND SEIZURE BY BARTLETT, MCHUGH, MORZELEWSKI, BAILEY, AND WYATT.

Finally, Plaintiffs allege that, at some point during the search and seizure, Bartlett, McHugh, Morzelewski, Bailey, and Wyatt became aware that there was a risk their named suspect (Italasano) lived in a separate unit within the Taylorsville Residence. This required the officers to retreat from their search and release Plaintiffs. Plaintiffs argue that the officers' failure to retreat and Plaintiffs' continued detention violated their Fourth Amendment rights.

### 1. Whether Bartlett, McHugh, Morzelewski, Bailey, and Wyatt Violated a Constitutional Right

First, the court must consider whether the officers violated Plaintiffs' constitutional rights.

The Fourth Amendment "protects the individual's privacy in a variety of settings." *Payton v. New York*, 445 U.S. 573, 589 (1980). And nowhere "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Id.* While the Fourth Amendment does not differentiate among types of "homes," a basic

principle of Fourth Amendment law is that "searching two or more apartments in the same building is no different than searching two or more completely separate houses." *United States v. Hinton*, 219 F.2d 324, 325–26 (7th Cir. 1955); *see also Garrison*, 480 U.S. at 90 (Blackmun, J., dissenting) (Fourth Amendment protection applies to an apartment, "the equivalent of a single-family house") (citing *Ker v. California*, 374 U.S. 23, 42 (1963)); *McDonald v. United States*, 335 U.S. 451, 454–55 (1948) (treating defendant's room in a "rooming house" as a home). Consequently, "[f]ederal courts have consistently held that the Fourth Amendment's requirement that a specific 'place' be described when applied to dwellings refers to a single living unit (the residence of one person or family). Thus, a warrant which describes an entire building when cause is shown for searching only one apartment is void." *Hinton*, 219 F.2d at 326 (citing *United States v. Barkouskas*, 38 F.2d 837 (M.D. Penn. 1930); *United States v. Diange*, 32 F. Supp. 994 (W.D. Penn, 1940); *United States v. Chin On*, 297 F. 531 (D. Mass. 1924); *United States v. Innelli*, 286 F. 731 (E.D. Penn. 1923); *United States v. Mitchell*, 274 F. 128 (N.D. Cal. 1921)); *see also United States v. Rios*, 611 F.2d 1335, 1347 (10th Cir. 1979) ("Generally a single warrant may authorize the search of several different places or residences; however probable cause must be shown for searching each area.") (citing *Hinton*, 219 F.2d at 325–26).

Sometimes, it is not readily apparent from a building's exterior (or even from its interior) whether it contains one or several homes. The Supreme Court addressed this issue in *Garrison* and held that a search becomes unconstitutional if it continues after officers realize, or reasonably should realize, that there are separate units within the area they are searching and the officers are therefore "put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." 480 U.S. at 87 (noting that officers "were required to discontinue the search of respondent's apartment as soon as they discovered that there were two

separate units on the third floor"); *see also Peterson v. Jensen*, 371 F.3d 1199, 1203 (10th Cir. 2004) ("[A]ny search or seizure that took place after the officers knew or reasonably should have known that they were in the wrong residence would no longer be protected by qualified immunity.") (quoting *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995)).

The *Garrison* analysis "applies to detentions as well. In particular, the Supreme Court has held that officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a *proper* search is conducted.'" *Harman v. Pollock*, 586 F.3d 1254, 1262 (10th Cir. 2009) ("*Harman II*") (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). Accordingly, "an officer's authority to detain the occupant of a residence while searching for contraband pursuant to a warrant lasts only as long as the search is proper." *Id.* (citing *Summers*, 452 U.S. at 705).

Because the officers' roles in the search and detention were distinct, the court considers in turn whether each officer violated Plaintiffs' Fourth Amendment rights.

*a. Bailey*

It is undisputed that Bailey searched Italasano's basement home. However, Plaintiffs do not present any evidence to suggest that he searched Plaintiffs' residence or participated in their detention. At oral argument, counsel for Plaintiffs conceded that Bailey is entitled to qualified immunity. Consequently, the court does not consider whether Bailey violated Plaintiffs' Fourth Amendment rights.

*b. Wyatt*

Wyatt's only involvement was as a photographer. While he photographed Italasano's basement home, it is unclear whether he ever entered Plaintiffs' residence. At oral argument, counsel for Plaintiffs conceded that Wyatt is also entitled to qualified immunity. Consequently, the court does not consider whether Wyatt violated Plaintiffs' Fourth Amendment rights.

### c. *Bartlett and McHugh*

In *Garrison*, "[t]he objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises." 480 U.S. at 88. The Court noted:

> Nothing [the suspect] did or said after he was detained outside 2036 Park Avenue would have suggested to the police that there were two apartments on the third floor . . . . When the officers entered the foyer on the third floor, neither [the suspect] nor [the plaintiff] informed them that they lived in separate apartments."

*Id.* at 88 n.12.

While the Supreme Court identified no objective facts suggesting a distinction between the third-floor apartments in *Garrison*, several facts available to Bartlett and McHugh suggested a distinction at the Taylorsville Residence. Indeed, the information McHugh omitted from his affidavit contained multiple strong indicia that the Taylorsville Residence contained separate living units. Those indicia were strong enough that McHugh and Bartlett discussed the possibility and even disclosed their concern to the UPD in a briefing.

That possibility became more certain when Bartlett and McHugh actually entered the Taylorsville Residence, which had objective indications that it contained separate units. Italasano's residence had a separate entrance, and it had the objective appearance of a separate unit, complete with a full kitchen and bathroom.[4] The only way to move between Italasano's portion of the basement to the rest of the home was through a door that had been bolted shut (until UPD put a hole through it) and that had been blocked (until Bartlett moved a sofa from Italasano's side of the door).

---

[4] Italasano's residence was so obviously its own separate living space that Officer Alcivar (who is not a defendant in this action) and Bartlett both referred to Italasano's home as a "basement apartment" in their incident reports.

In addition, Bartlett and McHugh were explicitly informed that there were separate living units within the Taylorsville Residence. Italasano told Bartlett that she rented a room from Hemingway and that she had "her own little apartment." Hemingway told McHugh that Italasano rented a portion of the basement and that Italasano's residence was separated from the rest of the home by an interior door with a lock, which McHugh verified. Daniel McGuire told Bartlett that he and Italasano lived in separate units. And during Plaintiffs' detention, Bartlett determined that Hemingway and her sons were not involved and even had Hemingway's handcuffs removed.

In short, the record indicates that Bartlett and McHugh knew early on (even before the UPD breached the doors) that there was a possibility that the Taylorsville Residence contained separate living units. Both officers knew that Hemingway and her sons were not included in the warrant or in the underlying affidavit. Neither believed Hemingway or her sons to be involved in Italasano's suspected drug trafficking. And once they entered the Taylorsville Residence, Bartlett and McHugh were informed (and saw the signs) that the building contained separate units. Nevertheless, Bartlett and McHugh kept Plaintiffs detained and searched their home.

Obviously, the point is moot if Italasano's basement residence was not, in fact, a separate unit. But a reasonable jury could find that it was. A reasonable jury could also find that Bartlett and McHugh knew or should have known that there were separate units in the Taylorsville Residence prior to entry and that their very entry violated Plaintiffs' rights. Or a reasonable jury could find that Bartlett and McHugh discovered that there were separate units shortly after entering and that any subsequent searches or detention violated Plaintiffs' rights. And even if a jury found that Bartlett and McHugh never discovered there were separate units, it could conclude that their failure to do so was not "objectively understandable and reasonable." *Garrison*, 480 U.S. at 88; *see also Harman v. Pollock*, 446 F.3d 1069, 1085 (10th Cir. 2006)

("*Harman I*") (concluding that "there are material facts in dispute as to the reasonableness of the officers' delay in realizing that they were at a separate residence not anticipated in the warrant" and that "factual disputes exist as to whether the full scale search took place after the officers should have realized they were in the wrong residence").

As the Tenth Circuit determined in *Harman I*, it is for a jury to decide these issues. 446 F.3d at 1085. But construing facts in favor of Plaintiffs on Defendants' motion for summary judgment, Bartlett and McHugh violated Plaintiffs' Fourth Amendment rights.

### d. Morzelewski

Morzelewski helped detain Plaintiffs and searched their home. He was not present at the UPD briefing where McHugh and Bartlett explained that the Hemingway family was not suspected of criminal involvement with Italasano. And there is no evidence that he had any prior knowledge of the Taylorsville Residence, of the information omitted from the warrant affidavit, of Plaintiffs, or of Italasano.

However, Morzelewski did observe the outward signs that there were separate units within the Taylorsville Residence. He was also present when Daniel McGuire explained that he and Italasano lived in separate basement units. Finding McGuire's explanation at least plausible, Morzelewski took the time to descend the internal stairway and peruse the basement. But after his search, he returned and continued to detain Plaintiffs.

As with Bartlett and McHugh, a reasonable jury could find that, at some point during the search and detention, Morzelewski became aware that the Taylorsville Residence contained separate units and that he was therefore on notice of the risk that he might be in a unit erroneously included in the warrant. Or a reasonable jury could conclude that his "failure to realize the overbreadth of the warrant" was not "objectively understandable and reasonable."

*Garrison*, 480 U.S. at 88. Construing facts in favor of Plaintiffs, Morzelewski also violated Plaintiffs' Fourth Amendment rights.

## 2. Whether the Right Asserted by Plaintiffs was Clearly Established

Because Bartlett, McHugh, and Morzelewski violated a constitutional right, the court must inquire whether the right was established at the time such that "every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308. Here, the constitutional right was clearly established.

In 1987, the Supreme Court in *Garrison* established that officers who discover they are searching pursuant to an overbroad search are required to discontinue their search; the Court also established that the validity of a search pursuant to an overbroad warrant depends on whether officers' failure to realize the overbreadth of the warrant was "objectively understandable and reasonable." 480 U.S. at 87–88. In that case, the Court considered the proper execution of a warrant commanding officers to search "the premises known as 2036 Park Avenue third floor apartment." 480 U.S. at 80. To the Court, the plain language of the warrant "indicate[d] that it was intended to authorize a search of the entire third floor." *Id.* at 82. But at some point during the search, the officers became aware that the third floor actually consisted of a common area and two distinct apartments. *Id.* at 81. Consequently, the warrant was overbroad.

The Supreme Court had no difficulty concluding that the officers legally entered the third-floor common area. *Id.* at 86. However, the Court noted that "[i]f the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to [one] apartment." *Id.* To the extent the officers did not know that the third floor contained two apartments, the officers "were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate

units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Garrison*, 480 U.S. at 87. Ultimately, the Court concluded that "the validity of the search . . . pursuant to a warrant authorizing the search of the entire third floor depend[ed] on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88. Because the officers' failure to realize the overbreadth of the warrant earlier was reasonable, the Court held that the officers had not violated the plaintiff's rights. *Id.*

In *Harman I* and *Harman II*, the Tenth Circuit twice applied the rule of *Garrison* to the search of a house and a detached garage located to the side and rear of the house. In *Harman I*, the court noted that "the defendants knew early on . . . before the SERT/SWAT team entry, there was a *possibility* that the garage was a separate residence." 446 F.3d at 1085. When the officers entered the garage, "this possibility became a strong suspicion." *Id.* And it was confirmed after the officers interviewed the plaintiffs and detained the suspects pursuant to the warrant. *Id.* Because "[e]ach of the officers had ample notice that the garage may have been a separate residence," and because "[n]either plaintiff resembled any target described in the warrant or the underlying affidavit," the court concluded that "there are material facts in dispute as to the reasonableness of the officers' delay in realizing that they were at a separate residence not anticipated in the warrant." *Id.* Furthermore, "factual disputes exist[ed] as to whether the full scale search took place after the officers should have realized they were in the wrong residence." *Id.*

On remand, the district court permitted additional discovery, and both parties sought summary judgment. The district court granted the officers' motion for summary judgment, and the plaintiffs appealed.

In *Harman II*, the plaintiffs' pivotal challenge relied on *Garrison*. They argued "that the Officers were put on notice, upon or just after the initial entry into the apartment, that the garage apartment was a separate and distinct residence from the main house under investigation," and that the officers should have left immediately thereafter. *Id.* at 1261. The officers countered that they "reasonably believed that the Plaintiffs' garage apartment was a 'crash pad' that was used to store and use drugs connected to the main residence." *Id.* They further contended that "the discovery of . . . marijuana in the Plaintiffs' apartment provided additional justification for the detention and searches." *Id.*

The court reaffirmed that, "[u]nder *Garrison*, once the Officers were put on notice of the risk that they entered a home that was unconnected to the illegal activity described in the warrant, they had an immediate duty to retreat." *Id.* (citation omitted). Still, the court agreed with the district court's analysis and concluded that the officers' "crash pad" theory found support in the record. *Id.* at 1262. And the indicia of a separate dwelling did not so thoroughly dispel the idea of a crash pad as to dispel probable cause. *Id.* The court's conclusion regarding the crash pad was bolstered by the officers' discovering marijuana in plain view while still reasonably believing that the plaintiffs were connected to the illegal activity at the main residence. *Id.* at 1265. [5]

---

[5] In *Harman II*, the Tenth Circuit suggested that, "[s]tanding alone, the Officers' 'crash pad' evidence and the marijuana in plain view may not have been sufficient to justify the full extent of the detention and searches under the Fourth Amendment." *Id.* at 1266. But taken together, they established "that the search and detention were reasonable under the Fourth Amendment." *Id.* at 1261. In this case, Defendants present no evidence that would suggest (and they have not argued) that Plaintiffs' home was a "crash pad" or that it was in any other way connected to Italasano's drug dealing. On the contrary, Bartlett and McHugh informed the UPD prior to the search that the Hemingways were not suspects. It is reasonable to infer that they also relayed this information to the Cottonwood Heights officers. The officers did discover some marijuana in Daniel McGuire's room. But Defendants do not argue that this discovery provided probable cause to continue searching Plaintiffs' residence.

In *Peterson v. Jensen*, the Tenth Circuit applied *Garrison* to the search of an apartment recently leased to new tenants. 371 F.3d 1199. In that case, officers obtained a search warrant (related to allegations against David Brown and Tarek Shejheur) for a Utah residence on March 31, 1999. But on April 4, 1999, the Peterson family leased the apartment. The next day, while the Petersons were moving in, the officers executed the search warrant. The officers quickly discovered none of the four occupants were Brown or Shejheur. Also, a moving van sat in front of the apartment, the Petersons had unloaded only a few boxes into the otherwise empty apartment, and the Petersons informed the officers that they had recently signed a lease and started to move in. Nevertheless, the officers continued searching the residence and detaining the Petersons. *Id.* at 1201.

The Petersons brought suit under § 1983, and the officers moved to dismiss. The district court denied the portion of the officers' motion relating to qualified immunity, and the Tenth Circuit heard the officers' appeal. Construing the Petersons' complaint liberally, the court held that the Petersons had alleged a constitutional violation ("that the defendants continued to search the premises *after* independently verifying that David Brown and Tarek Shejheur had moved out of the apartment"). *Id.* at 1202–03. The court noted that the purpose of the officers' search "was to examine the residence, the belongings, and the persons of David Brown and Tarek Shejheur." *Id.* at 1203. However, "[b]ecause Mr. Brown and Mr. Shejheur no longer lived there, searching the apartment did not fulfill the purpose of the warrant." *Id.* Consequently, the officers' continued search and detention violated well-established law under *Garrison*.[6]

---

[6] The court notes that, in holding that the relevant law was clearly established at the time of the search in *Peterson*, the Tenth Circuit cited only to *Garrison*, 480 U.S. at 87, and *Pray*, 49 F.3d at 1159. While the court here has cited *Harman I*, *Harman II*, and *Peterson* for the proposition that the law was clearly established at the time, it appears that the Tenth Circuit takes *Garrison* as sufficient precedent to establish the right Plaintiffs now claim.

Each of these cases was decided long before the officers executed the search warrant on the Taylorsville Residence. While there are notable factual differences between these cases and the one at bar, pre-existing law was sufficiently clear that the unlawfulness of Bartlett, McHugh, and Morzelewski's actions was apparent.

### D. CONCLUSION

In sum, Bailey and Wyatt are entitled to qualified immunity. However, viewing the facts in the light most favorable to Plaintiffs, Bartlett, McHugh, and Morzelewski violated Plaintiffs' clearly-established rights. Consequently, they are not entitled to qualified immunity.

## IV.     PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs argue that they are entitled to summary judgment against McHugh on Count 1 of the Amended Complaint: that the Magistrate would not have issued the warrant to search their residence but for McHugh's knowing or reckless misstatement and omissions.

However, as the court has already noted, and as the Tenth Circuit has long recognized, in civil rights cases, the question of probable cause is for the jury to decide. *See DeLoach*, 922 F.2d at 623. Viewing the evidence in the light most favorable to Defendants, there is room for a difference of opinion as to whether McHugh's alleged misstatements and omissions, if corrected and included, would have vitiated probable cause. Consequently, summary judgment on this claim is inappropriate.

## V.     ORDER

For the reasons above, Defendants' motion is **GRANTED IN PART AND DENIED IN PART.** Plaintiffs' motion is **DENIED.** The court orders as follows:

1.  Plaintiffs' second, third, fourth, and fifth causes of action are **DISMISSED WITH PREJUDICE.**

2. Defendant Bradley Bailey is entitled to qualified immunity. Plaintiffs' claims against him are **DISMISSED WITH PREJUDICE.**

3. Defendant Kevin Wyatt is entitled to qualified immunity. Plaintiffs' claims against him are **DISMISSED WITH PREJUDICE**.

4. In all other respects, Defendants' motion is **DENIED**.

Signed June 22, 2018

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge